IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **SETH BRUNNER, an individual**<br><br>　　*Plaintiff,*<br><br>　v.<br><br>**DYVE BIOSCIENCES, INC.,**<br><br>　　*Defendant*. | **Civil Action No.**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DECLARATORY JUDGMENT
## OF PATENT APPLICATION OWNERSHIP

Plaintiff Seth Brunner ("Brunner"), an individual, brings this action against Dyve Biosciences, Inc. ("Dyve") for a declaration that Brunner is the owner, or in the alternative, a co-owner of U.S. Patent Application Nos. 16/132,397 (the "'397 application"), 16/132,357 (the "'357 application"), and 16/132,358 (the "'358 application") as well as corresponding Patent Cooperation Treaty ("PCT") international patent applications (collectively, the "Brunner applications").

## INTRODUCTION

1. Seth Brunner invented novel and important topical formulations that allow for effective transdermal (through the skin) delivery of drugs. Transdermal delivery of drugs improves safety, efficacy, and ease of use compared to other drug delivery systems, such as oral ingestion (*e.g.*, taking a pill) or intravenous injection (*e.g.*, a shot). The transdermal delivery method invented by Brunner is the core of Dyve's business.

2. Dyve (also known previously as Ampersand Biopharmaceuticals, Inc. ("Ampersand")) is a small biopharmaceutical company founded in 2014. It hired Brunner in June

of 2017 at a salary of $30,000 (along with an incentive-based bonus for any grant funding obtained and a promised 0.3% of equity with a four year vesting schedule) to assist with obtaining grant funding for its existing products. Brunner and Dyve did not enter into any employment agreement at the time of his hiring. Nor did they enter into any agreement requesting or requiring Brunner to assign inventions or other intellectual property rights to Dyve.

3. After being hired, Brunner began to experiment in the lab on his own accord. Brunner tested numerous formulations and approaches, and by August of 2017, Brunner discovered new formulations for transdermal delivery. These formulations could be used in the treatment of cancer, gout, melasma, and many other medical issues.

4. When the first test results of Brunner's inventions came back, Brunner's inventions were hailed as breakthroughs by Dyve. Jeffrey Byers, the general manager of Topical Edge—one of Dyve's existing products—said Brunner had significantly improved the sensory aspects (*e.g.*, how the product feels when applied) compared to previous attempts. Dyve's CEO, Ryan Beal, told Brunner that Brunner's inventions had achieved surprisingly strong results regarding bioavailability (the amount of drug that enters circulation). In light of Brunner's inventions, Dyve doubled Brunner's annual salary, and explained that Brunner would receive additional compensation in the form of equity in the company.

5. Brunner repeatedly asked Beal to memorialize the cash and equity compensation Brunner was promised. However, the company was unable to answer even basic questions about the amount of equity Brunner would receive or the value of that equity.

6. Between February and August 2018, Dyve and Brunner exchanged a number of drafts and correspondence regarding a compensation offer made by Beal on February 20th, 2018. Ultimately, however, none of the offer letters adequately reflected all the compensation terms

previously discussed, nor did they address Brunner's concerns about missing terms such as equity vesting, anti-dilution, and other rights.

7. Dyve agreed to hire outside counsel for Brunner to assist with Brunner's negotiations. The parties continued to negotiate in late August and early September 2018. Brunner was presented with various invention assignment agreements, but he refused to sign them without an agreed-upon compensation package. Dyve fired Brunner on September 10, 2018 because he would not assign his inventions to Dyve without compensation.

8. Just days after firing Brunner, Dyve filed three patent applications related to Brunner's inventions, the '397 application, the '357 application, and the '358 application. Brunner was named as an inventor (among other inventors) on each patent application.

9. In each of the Brunner applications, Dyve falsely claimed to the United States Patent and Trademark Office ("PTO") that it was the "assignee of the entire right, title, and interest" of each of the applications. Dyve also falsely told the PTO in each application it had an assignment from all the named inventors. Brunner never assigned the rights to any of his inventions to Dyve. An example from the '358 application is provided below.

Dyve continues to market and tout the efficacy and potential of Brunner's inventions. Indeed, Brunner's inventions are the core of Dyve's business. For example, the '357 application Abstract notes that the inventions disclosed treat cancer as well as "melasma, gout, skin disorders, and other diseases and disorders." Brunner's inventions are at the heart of the two drug development pipelines Dyve is working on related to treating gout and melasma.

4



DYVE WEBSITE, *available at*: https://dyvebio.com/pipeline/.

10. As the inventor, Brunner owns the rights to his inventions. Brunner never assigned his inventions to Dyve. Further, Brunner never agreed in writing to assign his inventions to Dyve nor was he hired by Dyve to invent or solve particular technical problems. Brunner was hired to write funding grant requests. Consequently, he owns the Brunner applications and any future applications Dyve may file related to Brunner's inventions. At minimum, Brunner maintains an undivided ownership interest in each of the applications filed by Dyve, and any future applications Dyve may file related to Brunner's inventions.

11. Dyve has placed Brunner in an untenable position by denying his ownership rights. Brunner deserves to be able to earn a living from his inventions. Brunner expected that Dyve would, as it promised, compensate him for his inventions, which are crucial to the success of Dyve's business. Further, as the owner, or as a joint owner, of the patent applications filed by

5

Dyve, Brunner is entitled to license his inventions to others. Given Dyve's refusal to compensate Brunner for his inventions, Brunner desires to license his inventions to another company. Dyve however, refuses to recognize Brunner's ownership interests. Dyve has created a cloud over the ownership of Brunner's inventions through its misrepresentations to the PTO and its statements claiming to be the sole owner of Brunner's inventions. Brunner is unable to adequately pursue licensing opportunities for his inventions while Dyve improperly claims sole ownership of them. Brunner therefore respectfully requests that the Court declare Brunner the owner of the Brunner applications, or in the alternative, a co-owner, so that Brunner may pursue his rights to exploit his inventions.

## THE PARTIES

### A. SETH BRUNNER

12. Seth Brunner is an individual residing in the State of California.

13. Brunner graduated from the Virginia Military Institute in 2005 with a Bachelor of Science in Chemistry. He has worked in the fields of chemistry, material science, medical devices, and materials engineering.

14. Brunner began working at Dyve on June 7, 2017. Brunner was hired to seek out research grant opportunities for Dyve's existing product lines. At the time of his hire, Brunner's salary was $30,000 annually, with an incentive-based bonus of 10% of any non-dilutive funding awarded through successful grant applications.

15. Working in the lab independently, Brunner began experimenting and creating new formulas. Just months after starting, Brunner invented a novel formulation for the transdermal administration of buffering agents that relate to a number of products offered by Dyve and its spin off companies, including products for muscle recovery and gout and cancer treatments. As

part of this discovery, and through substantial work in the lab, Brunner invented new formulations for buffering agents that far exceeded the efficacy of all of Dyve's prior technology.

16. Brunner never signed an employment agreement with Dyve, nor did he ever sign an agreement transferring rights to any of his inventions. Brunner wished to sign such an agreement once his compensation package had been adequately defined, but Dyve never provided Brunner a coherent offer.

### B. DYVE BIOSCIENCES, INC.

17. On information and belief, Dyve is a corporation organized and existing under the laws of the State of Delaware, with a principle place of business at 2545 West Hillcrest Drive, Suite 215, Thousand Oaks, CA 91320. On information and belief, Dyve was founded in 2014.

18. On information and belief, Dyve was first known as Intellectual Property Associates LLC; Later, it became Ampersand Biopharmaceuticals LLC.

19. Dyve touts itself as having "created breakthrough platform technology that broadly enables transdermal drug delivery." Dyve describes the company as follows:



DYVE WEBSITE, *available at*: https://dyvebio.com/company/.

## JURISDICTION AND VENUE

20. This action arises under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq*. and the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202. This Court has subject matter jurisdiction over the action under 28 U.S.C. §1331 and §1338(a), based on Dyve's denial of Brunner's ownership interest in the Brunner applications, which forms the existence of an actual controversy between Brunner on the one hand, and Dyve on the other, for claims under the Patent Laws. *See infra.*

21. This Court has jurisdiction over Defendant Dyve because Dyve transacts and does business in this District and is incorporated in this District.

22. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2).

## **FACTUAL ALLEGATIONS**

23.     In mid-2017, Brunner and Dyve entered into compensation discussions. Even though he still had no formal agreement, Brunner began his work for Dyve. Prior to Brunner's inventive efforts, Dyve had been investigating formulas with relatively large amounts of lecithin organogel. After reviewing Dyve's formulas and products, Brunner felt that they would have limited commercial appeal given the gritty, greasy feeling of the product.

24.     In light of his conclusions that Dyve's existing product would have limited commercial impact, Brunner decided to experiment and create his own formulas. No one at Dyve asked or told Brunner to research how to improve Dyve's products; Brunner undertook the research on his own volition because he wanted to make a product that worked and would have wide commercial appeal. Through experiments and tests in the lab, Brunner discovered that he could use lesser amounts of lecithin combined with a significant amount of buffering agent to deliver the target drug with a much better sensory aspect (e.g., feel) to the patient. Brunner also improved how Dyve's formulas were processed, including by experimenting with and then adopting new methods of processing that would make production commercially scalable.

25.     Brunner expected that Dyve would reward him for any important contributions he made to the company. Brunner worked long hours for minimal salary.

26.     Dyve recognized Brunner's important contributions and said it would reward him by increasing his salary and finalizing his compensation agreement with additional equity.

27.     Between August and December 2017, Brunner continued to test formulations related to transdermal drug delivery, among other areas, which were based on his inventions. Brunner continued to press at least weekly for a finalized employment agreement with clarity around strike price, cap table, and enterprise structure, among other things. Dyve continued to

promise all this information "soon," once Dyve had converted to a C-corporation. However, Dyve continued to delay providing any clarity on what equity Brunner would receive in exchange for his inventions.

28. On December 14, 2017, Brunner and others received an equity memo from CEO Beal that provided even less equity than the initial compensation offer Beal promised Brunner for grant writing in June of 2017. Brunner was surprised by this offer, especially in light of the inventions he had made and the promises made by Dyve.

29. After receiving the memo in December, Brunner sat down with Dorsey Kleger-Heine, Dyve's outside general counsel at the time, to discuss his role with the company. Brunner informed Ms. Kleger-Heine that he still did not have an employment agreement in place and that he would not sign anything until his compensation agreement was properly documented.

30. On February 14, Brunner then told Jeffrey Byers, General Manager of Topical Edge, that he was frustrated with the incomplete paperwork and the fact that he still did not have a written compensation agreement in place.

31. A day later, on February 15, Brunner and Beal had another conversation. Beal took responsibility for failing to get Brunner's compensation package finalized. On February 20, 2018, Brunner attended a meeting with Beal to again discuss a compensation agreement. Beal promised to have a complete agreement prepared by the end of March. However, Beal did not provide Brunner with an agreement by the end of March.

32. In the spring of 2018, Dyve hired Jim McGee to be its Chief Operating Officer. McGee recognized that many employment and equity agreements, including Brunner's, had not been finalized. Since Beal never provided Brunner with the agreement promised by the end of March, Brunner and McGee met in June to go over the compensation package Brunner and Beal

had discussed in February. As a new employee, McGee was not familiar with the history of Brunner's compensation negotiations nor the inventive accomplishments of Brunner.

33.     On July 10, 2018, Beal and McGee spoke with Brunner about compensation again. The CEO and COO presented Brunner with a table proposing vesting of a 2.867% equity pool. Two days later, McGee emailed an employment offer, but the offer did not represent the table that Brunner had been given on July 10. After more than five months, Dyve still had not given Brunner an employment agreement that matched the tentative agreement he and Beal had reached in February.

34.     All told, Brunner had been asking Dyve to finalize his employment and compensation agreement for more than a year. Dyve repeatedly promised it would finalize an agreement, but either failed to provide any agreement or left out key conditions that Brunner had been promised. Finally, Dyve agreed to hire an attorney for Brunner to assist Brunner's negotiations with the company, but limited that representation to eight hours.

35.     A week later, on July 31, 2018, all employees at Dyve received an email from McGee about a change to their option agreement and incentive plans. McGee asked all employees to re-sign their agreements. Brunner did not sign the agreement. Dyve's new human resources representative sent Brunner a reminder to sign the agreement. Brunner replied that he could not sign the agreement until his compensation agreement was finalized.

36.     On August 30, 2018, Dyve delivered an ultimatum to Brunner through his attorney that Brunner must sign his employment agreement.

37.     On September 10, 2018 at 5:53 p.m., Brunner's attorney emailed Barlow a proposed offer. Around 6:00 p.m., Brunner became aware that he was locked out of his Dyve

email account. Brunner's attorney later received an email stating that Dyve had terminated Brunner.

38. Just a few days after firing Brunner, Dyve filed patent applications based on Brunner's inventions. Specifically, on September 14, 2018, Dyve filed the '357 and '358 applications. A day later Dyve filed the '397 application. In each, Dyve falsely told the PTO that Dyve was the sole owner of the Brunner applications and that Brunner had assigned to Dyve his rights to his inventions. Dyve continues to prosecute the Brunner applications without input or cooperation from Brunner.

39. Approximately one week before his firing, Brunner sent several samples based on his inventions to a company spun off from Dyve called Amp Human Performance ("Amp"). On information and belief, at that time the products sold by Amp were based on Dyve's previous technology. Consequently, these products exhibit the greasy, unpleasant feel that Brunner's inventions helped solve. On August 12, 2019, Amp tweeted that it would soon be selling a "new and improved formula" that, on information and belief, is based on Brunner's inventions. Soon after, Amp launched an advertising campaign explicitly showing the differences between the previous product based on Dyve's earlier formulas, and the product that, on information and belief, is based on Brunner's inventions:



KICKSTARTER WEBSITE, AMP HUMAN PERFORMANCE WEBPAGE, *available at*: https://www.kickstarter.com/projects/amp-human/pr-lotion-a-performance-and-recovery-sports-lotion.

40. Brunner, as an inventor, owns his inventions. He never assigned those inventions to Dyve. By improperly asserting ownership over all of Brunner's inventions to Brunner, to third-party companies, and to the Patent Office, Dyve is depriving Brunner of his ownership rights to his inventions. Dyve is also precluding Brunner from seeking compensation from other companies in exchange for licenses to Brunner's inventions. Finally, Dyve is preventing Brunner from taking over, or in the alternative participating in, the prosecution of the Brunner

13

applications in front of the PTO. Consequently, a dispute exists between Brunner and Dyve as to the ownership of the Brunner applications.

## COUNT I
### (Declaratory Judgment of Patent Application Ownership of the Brunner Applications)

41. Brunner realleges and incorporates by reference the allegations set forth in paragraphs 1-40.

42. Based on the foregoing, Brunner is the sole owner of the Brunner applications, as well as the technology and inventions underlying those applications and disclosed therein.

43. Based on the foregoing, Brunner may exclude others from practicing any inventions from claims that issue from the Brunner applications. Brunner also may license any inventions disclosed and/or claimed in the Brunner applications (and any patents that may issue from the Brunner applications).

44. Based on the foregoing, Dyve's actions have clouded and continue to cloud Brunner's ownership rights and title to the Brunner applications and inventions disclosed therein. Dyve intends to continue its unlawful activity, and Brunner continues to and will continue to suffer irreparable harm—for which there is no adequate remedy at law—from Dyve's unlawful activity unless this Court declares and confirms Brunner's rights concerning the Brunner applications and inventions disclosed therein, and enjoins Dyve from asserting ownership of the Brunner applications. Absent a declaration from this Court, Dyve will continue to take actions inconsistent with Brunner's ownership in the Brunner applications, and Brunner will continue to be damaged by Dyve's actions.

## COUNT II
### (Declaratory Judgment Of Co-Ownership Of The Brunner Applications)

45. Brunner realleges and incorporates by reference the allegations set forth in paragraphs 1-40.

46. Based on the foregoing, and in the alternative, Brunner is at minimum a co-owner of the Brunner applications, as well as the technology and inventions underlying those applications and disclosed therein. Dyve, at most, is a co-owner of the Brunner applications.

47. Based on the foregoing, Brunner is authorized to license any inventions disclosed and/or claimed in the Brunner applications (and any patents that may eventually issue from the Brunner applications).

48. Based on the foregoing, Dyve's actions have clouded and continue to cloud Brunner's ownership rights and title to the Brunner applications and inventions disclosed therein. Dyve intends to continue its unlawful activity, and Brunner continues to and will continue to suffer irreparable harm—for which there is no adequate remedy at law—from Dyve's unlawful activity unless this Court declares and confirms Brunner's rights concerning the Brunner applications and inventions disclosed therein, and enjoins Dyve from indicating that it is the sole owner of the Brunner applications. Absent a declaration from this Court, Dyve will continue to take actions inconsistent with Brunner's ownership in the Brunner applications, and Brunner will continue to be damaged by Dyve's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brunner respectfully asks the Court to:

A. Declare that Brunner is the owner of each of the Brunner applications and the technology and inventions underlying and disclosed therein;

B. Declare that Defendant Dyve is estopped from asserting any claim inconsistent with Brunner's ownership of the Brunner applications, and the technology and inventions underlying and disclosed therein;

C. Declare that Defendant Dyve is estopped from prosecuting the Brunner applications in front of the United States Patent and Trademark Office;

D. Declare that Defendant Dyve's actions have been intentional, willful, deliberate, and/or in bad faith;

E. Award Brunner enhanced damages, as well as Brunner's expenses, costs, and attorneys' fees as provided by law;

F. Issue a permanent injunction enjoining Defendant Dyve from further actions inconsistent with Brunner's ownership and rights to the Brunner applications, any resulting technology, and any other inventions of Brunner's;

G. Award Brunner such other and further relief as this Court may deem just and proper.

IN THE ALTERNATIVE, Plaintiff Brunner respectfully asks the Court to:

A. Declare that Brunner is a co-owner of each of the Brunner applications and the technology and inventions underlying and disclosed therein;

B. Declare that Brunner is authorized to license any inventions disclosed and/or claimed in the Brunner applications (and any patents that may issue based on the Brunner applications);

C. Declare that Defendant Dyve is estopped from asserting any claim inconsistent with Brunner's co-ownership of the Brunner applications, and the technology and inventions underlying and disclosed therein;

D. Declare that Defendant Dyve is estopped from prosecuting the Brunner applications in front of the United States Patent and Trademark Office without Brunner's participation;

E. Declare that Defendant Dyve's actions have been intentional, willful, deliberate, and/or in bad faith;

F. Award Brunner enhanced damages, as well as Brunner's expenses, costs, and attorneys' fees as provided by law;

G. Issue a permanent injunction enjoining Defendant Dyve from further actions inconsistent with Brunner's ownership and rights to the Brunner applications, any resulting technology, and any other inventions of Brunner's;

H. Award Brunner such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Brunner requests a trial by jury of any issues so triable by right.

Dated: September 5, 2019

| OF COUNSEL: | BAYARD, P.A. |
|---|---|
| Dorian S. Berger | /s/ Stephen B. Brauerman |
| Daniel P. Hipskind | Stephen B. Brauerman (#4952) |
| Eric B. Hanson | 600 N. King Street, Suite 400 |
| BERGER & HIPSKIND LLP | P.O. Box 25130 |
| 9538 Brighton Way, Ste. 320 | Wilmington, Delaware 19801 |
| Beverly Hills, CA 90210 | (302) 655-5000 |
| (323) 886-3430 | sbrauerman@bayardlaw.com |
| dsb@bergerhipskind.com | |
| dph@bergerhipskind.com | *Attorneys for Plaintiff Seth Brunner* |
| ebh@bergerhipskind.com | |