**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SETH BRUNNER, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 19-1663-MN |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| DYVE BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER TO COMPLAINT AND COUNTERCLAIMS

Defendant Dyve Biosciences, Inc., by and through its undersigned attorneys, hereby responds to the Complaint filed by Plaintiff Seth Brunner. Defendant denies all allegations, including any allegations in headings and footnotes, not expressly admitted herein.

Plaintiff's claims are meritless. First, contrary to the Complaint's allegations, Plaintiff signed multiple agreements pursuant to which he assigned to Dyve any and all intellectual property he developed in the course of his employment with Dyve. This includes a Non-Disclosure Agreement, an Employment Agreement he signed when he began his employment at Dyve, and an Employee Proprietary Information and Invention Agreement. Each of these agreements contains provisions pursuant to which Brunner assigned to Dyve anything he invented while at Dyve, including the patent applications at issue in the Complaint (to the extent the actual, limited role Plaintiff played in the development of those applications would otherwise give him any ownership rights).

Second, because Dyve specifically hired Plaintiff to invent (not to develop grants), the "hired to invent" doctrine applies under state and Federal law. Pursuant to that doctrine, any intellectual property that Plaintiff conceived, developed or acquired through his employment with Dyve was assigned to Dyve.

Third, Dyve is required to bring counterclaims against Plaintiff because he breached his employment agreement in multiple respects, including by filing litigation in this Court while his employment agreement requires him to file suit in the federal or state courts of California. As explained more fully in the counterclaims, Plaintiff also breached the assignment and confidentiality provisions of his employment agreement by asserting ownership over Dyve's intellectual property and maintaining possession of Dyve's confidential information and communications. Due to Brunner's multiple breaches of his employment agreement, Dyve is forced to seek damages from Brunner in this Court, including the Company's attorneys' fees and expenses incurred in defending against Brunner's meritless claims as well as the costs incurred to prosecute the counterclaims.

### INTRODUCTION[1]

1.        Seth Brunner invented novel and important topical formulations that allow for effective transdermal (through the skin) delivery of drugs. Transdermal delivery of drugs improves safety, efficacy, and ease of use compared to other drug delivery systems, such as oral ingestion (*e.g.*, taking a pill) or intravenous injection (*e.g.*, a shot). The transdermal delivery method invented by Brunner is the core of Dyve's business.

**ANSWER:** The allegations of Paragraph 1 are denied, except it is admitted that transdermal delivery of drugs can improve safety, efficacy, and ease of use compared to other drug delivery systems.

2.        Dyve (also known previously as Ampersand Biopharmaceuticals, Inc. ("Ampersand")) is a small biopharmaceutical company founded in 2014. It hired Brunner in June of 2017 at a salary of $30,000 (along with an incentive-based bonus for any grant funding obtained and a promised 0.3% of equity with a four year vesting schedule) to assist with obtaining grant funding for its existing products. Brunner and Dyve did not enter into any employment agreement

---

[1] Defendant's use herein of defined terms in the Complaint should not be interpreted as and is not an admission that (i) Defendant agrees with Plaintiff's characterization or use of the defined terms, (ii) the defined terms are accurate, or (iii) the documents or items described by the defined terms actually exist. Defendant uses these defined terms solely for purposes of responding to the allegations of the Complaint. Defendant denies that the headings contained in the Complaint constitute allegations of fact and denies them to the extent they are considered as such.

at the time of his hiring.  Nor did they enter into any agreement requesting or requiring Brunner to assign inventions or other intellectual property rights to Dyve.

**ANSWER:**  The allegations of the first sentence of Paragraph 2 are admitted, except as to the characterization of Dyve as a small company.  The allegations of the second, third, and fourth sentences of Paragraph 2 are denied, except it is admitted that Dyve hired Brunner in June 2017 at a salary of $30,000.

3.      After being hired, Brunner began to experiment in the lab on his own accord. Brunner tested numerous formulations and approaches, and by August of 2017, Brunner discovered new formulations for transdermal delivery.  These formulations could be used in the treatment of cancer, gout, melasma, and many other medical issues.

**ANSWER:** The allegations of Paragraph 3 are denied.

4.      When the first test results of Brunner's inventions came back, Brunner's inventions were hailed as breakthroughs by Dyve.  Jeffrey Byers, the general manager of Topical Edge—one of Dyve's existing products—said Brunner had significantly improved the sensory aspects (*e.g.*, how the product feels when applied) compared to previous attempts.  Dyve's CEO, Ryan Beal, told Brunner that Brunner's inventions had achieved surprisingly strong results regarding bioavailability (the amount of drug that enters circulation).  In light of Brunner's inventions, Dyve doubled Brunner's annual salary, and explained that Brunner would receive additional compensation in the form of equity in the company.

**ANSWER:** The allegations of Paragraph 4 are denied, except the allegations of the second sentence of Paragraph 4 are admitted.

5.      Brunner repeatedly asked Beal to memorialize the cash and equity compensation Brunner was promised.  However, the company was unable to answer even basic questions about the amount of equity Brunner would receive or the value of that equity.

**ANSWER:** The allegations of Paragraph 5 are denied.

6.      Between February and August 2018, Dyve and Brunner exchanged a number of drafts and correspondence regarding a compensation offer made by Beal on February 20th, 2018. Ultimately, however, none of the offer letters adequately reflected all the compensation terms previously discussed, nor did they address Brunner's concerns about missing terms such as equity vesting, anti-dilution, and other rights.

**ANSWER:** The allegations of Paragraph 6 are denied, except it is admitted that between February and August 2018, Dyve and Brunner discussed potential terms for an increase in compensation and equity grants.

7.      Dyve agreed to hire outside counsel for Brunner to assist with Brunner's negotiations.  The parties continued to negotiate in late August and early September 2018. Brunner was presented with various invention assignment agreements, but he refused to sign them without an agreed-upon compensation package.  Dyve fired Brunner on September 10, 2018 because he would not assign his inventions to Dyve without compensation.

**ANSWER:** The allegations of the first sentence of Paragraph 7 are admitted.  The allegations of the remaining sentences are denied, except it is admitted that Dyve and Brunner discussed potential terms for an increase in his compensation and equity in August and early September 2018 and Dyve terminated Brunner's employment on September 10, 2018.

8.      Just days after firing Brunner, Dyve filed three patent applications related to Brunner's inventions, the '397 application, the '357 application, and the '358 application. Brunner was named as an inventor (among other inventors) on each patent application.

**ANSWER:** The allegations of the first sentence of Paragraph 8 are denied, except it is admitted that Dyve filed U.S. Patent Applications 16/132,397, 16/132,357, 16/132,358 in September 2018.  The second sentence of Paragraph 8 purports to characterize the contents of the '397 application, the '357 application, and the '358 application, to which Dyve respectfully refers the Court for a complete statement of their contents.  To the extent that the allegations of the second sentence of Paragraph 8 are inconsistent with the '397 application, the '357 application, and the '358 application, they are denied.

9.      In each of the Brunner applications, Dyve falsely claimed to the United States Patent and Trademark Office ("PTO") that it was the "assignee of the entire right, title, and interest" of each of the applications.  Dyve also falsely told the PTO in each application it had an assignment from all the named inventors.  Brunner never assigned the rights to any of his inventions to Dyve.  An example from the '358 application is provided below.

PTO/AIA/96 (08-12)
Approved for use through 01/31/2013. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(c)

Applicant/Patent Owner: AMPERSAND BIOPHARMACEUTICALS, INC.

Application No./Patent No.: _____ Filed/Issue Date: 2018-09-14

Titled: METHODS AND FORMULATIONS FOR TRANSDERMAL ADMINISTRATION OF BUFFERING AGENTS

AMPERSAND BIOPHARMACEUTICALS, INC. , a corporation

(Name of Assignee)                                    (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that, for the patent application/patent identified above, it is (choose **one** of options 1, 2, 3 or 4 below):

1. ☑ The assignee of the entire right, title, and interest.

2. ☐ An assignee of less than the entire right, title, and interest (check applicable box):

  ☐ The extent (by percentage) of its ownership interest is _____%. Additional Statement(s) by the owners holding the balance of the interest **must be submitted** to account for 100% of the ownership interest.

  ☐ There are unspecified percentages of ownership. The other parties, including inventors, who together own the entire right, title and interest are:

  Additional Statement(s) by the owner(s) holding the balance of the interest **must be submitted** to account for the entire right, title, and interest.

3. ☐ The assignee of an undivided interest in the entirety (a complete assignment from one of the joint inventors was made). The other parties, including inventors, who together own the entire right, title, and interest are:

  Additional Statement(s) by the owner(s) holding the balance of the interest **must be submitted** to account for the entire right, title, and interest.

4. ☐ The recipient, via a court proceeding or the like (e.g., bankruptcy, probate), of an undivided interest in the entirety (a complete transfer of ownership interest was made). The certified document(s) showing the transfer is attached.

The interest identified in option 1, 2 or 3 above (not option 4) is evidenced by either (choose **one** of options A or B below):

A. ☑ An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel _____, Frame _____, or for which a copy thereof is attached.

B. ☐ A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

  1. From: _____     To: _____
    The document was recorded in the United States Patent and Trademark Office at
    Reel _____, Frame _____, or for which a copy thereof is attached.

  2. From: _____     To: _____
    The document was recorded in the United States Patent and Trademark Office at
    Reel _____, Frame _____, or for which a copy thereof is attached.

[Page 1 of 2]

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Dyve continues to market and tout the efficacy and potential of Brunner's inventions. Indeed, Brunner's inventions are the core of Dyve's business. For example, the '357 application Abstract notes that the inventions disclosed treat cancer as well as "melasma, gout, skin disorders, and other diseases and disorders." Brunner's inventions are at the heart of the two drug development pipelines Dyve is working on related to treating gout and melasma.

DYVE WEBSITE, *available at*: https://dyvebio.com/pipeline/.

**ANSWER:** The allegations of Paragraph 9 are denied.  To the extent the allegations of Paragraph 9 purport to characterize the contents of the '397 application, the '357 application, and the '358 application, Dyve respectfully refers the Court to such applications for a complete statement of their contents.  To the extent that the allegations of Paragraph 9 are inconsistent with the'397 application, the '357 application, and the '358 application, they are denied.  Dyve denies that the statements in any of the applications are false.

10.     As the inventor, Brunner owns the rights to his inventions.  Brunner never assigned his inventions to Dyve.  Further, Brunner never agreed in writing to assign his inventions to Dyve nor was he hired by Dyve to invent or solve particular technical problems. Brunner was hired to write funding grant requests.  Consequently, he owns the Brunner applications and any future applications Dyve may file related to Brunner's inventions.  At minimum, Brunner maintains an undivided ownership interest in each of the applications filed by Dyve, and any future applications Dyve may file related to Brunner's inventions.

6

**ANSWER:** The allegations of Paragraph 10 are denied.

11.     Dyve has placed Brunner in an untenable position by denying his ownership rights. Brunner deserves to be able to earn a living from his inventions.  Brunner expected that Dyve would, as it promised, compensate him for his inventions, which are crucial to the success of Dyve's business.  Further, as the owner, or as a joint owner, of the patent applications filed by Dyve, Brunner is entitled to license his inventions to others.  Given Dyve's refusal to compensate Brunner for his inventions, Brunner desires to license his inventions to another company.  Dyve however, refuses to recognize Brunner's ownership interests.  Dyve has created a cloud over the ownership of Brunner's inventions through its misrepresentations to the PTO and its statements claiming to be the sole owner of Brunner's inventions.  Brunner is unable to adequately pursue licensing opportunities for his inventions while Dyve improperly claims sole ownership of them.  Brunner therefore respectfully requests that the Court declare Brunner the owner of the Brunner applications, or in the alternative, a co-owner, so that Brunner may pursue his rights to exploit his inventions.

**ANSWER:** Dyve denies the allegations of Paragraph 11, except it is admitted that

Brunner does not have any ownership interest in the referenced patent applications.

## THE PARTIES

### A.    SETH BRUNNER

12.     Seth Brunner is an individual residing in the State of California.

**ANSWER:** The allegations of Paragraph 12 are admitted on information and belief.

13.     Brunner graduated from the Virginia Military Institute in 2005 with a Bachelor of Science in Chemistry.  He has worked in the fields of chemistry, material science, medical devices, and materials engineering.

**ANSWER:** Defendant lacks information sufficient to admit or deny the allegations of

Paragraph 13.

14.     Brunner began working at Dyve on June 7, 2017.  Brunner was hired to seek out research grant opportunities for Dyve's existing product lines.  At the time of his hire, Brunner's salary was $30,000 annually, with an incentive-based bonus of 10% of any non-dilutive funding awarded through successful grant applications.

**ANSWER:** The allegations of Paragraph 14 are denied, except it is admitted that

Brunner's salary was $30,000 annually when he began working at Dyve.

15.     Working in the lab independently, Brunner began experimenting and creating new formulas.  Just months after starting, Brunner invented a novel formulation for the transdermal administration of buffering agents that relate to a number of products offered by Dyve and its spin off companies, including products for muscle recovery and gout and cancer treatments.  As part of this discovery, and through substantial work in the lab, Brunner invented new formulations for buffering agents that far exceeded the efficacy of all of Dyve's prior technology.

**ANSWER:** The allegations of Paragraph 15 are denied.

16.     Brunner never signed an employment agreement with Dyve, nor did he ever sign an agreement transferring rights to any of his inventions.  Brunner wished to sign such an agreement once his compensation package had been adequately defined, but Dyve never provided Brunner a coherent offer.

**ANSWER:** The allegations of Paragraph 16 are denied.

**B. DYVE BIOSCIENCES, INC.**

17.     On information and belief, Dyve is a corporation organized and existing under the laws of the State of Delaware, with a principle place of business at 2545 West Hillcrest Drive, Suite 215, Thousand Oaks, CA 91320.  On information and belief, Dyve was founded in 2014.

**ANSWER:** The allegations of Paragraph 17 are admitted.

18.     On information and belief, Dyve was first known as Intellectual Property Associates LLC; Later, it became Ampersand Biopharmaceuticals LLC.

**ANSWER:** The allegations of Paragraph 18 are admitted.

19.     Dyve touts itself as having "created breakthrough platform technology that broadly enables transdermal drug delivery." Dyve describes the company as follows:



DYVE WEBSITE, *available at*: https://dyvebio.com/company/.

**ANSWER:** The allegations of Paragraph 19 purport to characterize the contents of Dyve's website, to which Dyve respectfully refers the Court for a complete statement of its contents. To the extent that the allegations of Paragraph 19 are inconsistent with Dyve's website, they are denied.

## JURISDICTION AND VENUE

20. This action arises under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq*. and the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202. This Court has subject matter jurisdiction over the action under 28 U.S.C. §1331 and §1338(a), based on Dyve's denial of Brunner's ownership interest in the Brunner applications, which forms the existence of an actual controversy between Brunner on the one hand, and Dyve on the other, for claims under the Patent Laws. *See infra.*

**ANSWER:** The allegations of Paragraph 20 constitute legal conclusions, to which no response is required, but to the extent one is required, Dyve denies those allegations.

21. This Court has jurisdiction over Defendant Dyve because Dyve transacts and does business in this District and is incorporated in this District.

**ANSWER:** The allegations of Paragraph 21 constitute legal conclusions, to which no response is required, but to the extent one is required, Dyve denies those allegations.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2).

**ANSWER:** The allegations of Paragraph 22 constitute legal conclusions, to which no response is required, but to the extent one is required, Dyve denies those allegations.  Dyve further avers that venue in this District is improper under Plaintiff's Employment Agreement, dated June 8, 2017.

## FACTUAL ALLEGATIONS

23.     In mid-2017, Brunner and Dyve entered into compensation discussions.  Even though he still had no formal agreement, Brunner began his work for Dyve.  Prior to Brunner's inventive efforts, Dyve had been investigating formulas with relatively large amounts of lecithin organogel.  After reviewing Dyve's formulas and products, Brunner felt that they would have limited commercial appeal given the gritty, greasy feeling of the product.

**ANSWER:** The allegations of the first three sentences of Paragraph 23 are denied, except it is admitted that Brunner began working for Dyve in June 2017.  Dyve lacks knowledge or information sufficient to form a belief as to the allegations of the fourth sentence of Paragraph 23, and on that basis, denies those allegations.

24.     In light of his conclusions that Dyve's existing product would have limited commercial impact, Brunner decided to experiment and create his own formulas.  No one at Dyve asked or told Brunner to research how to improve Dyve's products; Brunner undertook the research on his own volition because he wanted to make a product that worked and would have wide commercial appeal.  Through experiments and tests in the lab, Brunner discovered that he could use lesser amounts of lecithin combined with a significant amount of buffering agent to deliver the target drug with a much better sensory aspect (e.g., feel) to the patient.  Brunner also improved how Dyve's formulas were processed, including by experimenting with and then adopting new methods of processing that would make production commercially scalable.

**ANSWER:** The allegations of Paragraph 24 are denied, except it is admitted that Brunner conducted research at the direction of Dyve as part of the regular duties of his job.

10

25.     Brunner expected that Dyve would reward him for any important contributions he made to the company.  Brunner worked long hours for minimal salary.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to Brunner's supposed expectations as alleged in the first sentence of Paragraph 25 and on that basis, denies those allegations.  The allegations of the second sentence of Paragraph 25 are denied.

26.     Dyve recognized Brunner's important contributions and said it would reward him by increasing his salary and finalizing his compensation agreement with additional equity.

**ANSWER:** The allegations of Paragraph 26 are denied, except it is admitted that in early 2018 Dyve agreed to consider and discuss a possible increase in compensation with Brunner, including higher salary and additional equity option grants.

27.     Between August and December 2017, Brunner continued to test formulations related to transdermal drug delivery, among other areas, which were based on his inventions. Brunner continued to press at least weekly for a finalized employment agreement with clarity around strike price, cap table, and enterprise structure, among other things.  Dyve continued to promise all this information "soon," once Dyve had converted to a C-corporation.  However, Dyve continued to delay providing any clarity on what equity Brunner would receive in exchange for his inventions.

**ANSWER:** The allegations of Paragraph 27 are denied, except it is admitted that Brunner continued to work in research and development for Dyve during this time period.

28.     On December 14, 2017, Brunner and others received an equity memo from CEO Beal that provided even less equity than the initial compensation offer Beal promised Brunner for grant writing in June of 2017.  Brunner was surprised by this offer, especially in light of the inventions he had made and the promises made by Dyve.

**ANSWER:** The allegations of Paragraph 28 are denied.

29.     After receiving the memo in December, Brunner sat down with Dorsey Kleger-Heine, Dyve's outside general counsel at the time, to discuss his role with the company.  Brunner informed Ms. Kleger-Heine that he still did not have an employment agreement in place and that he would not sign anything until his compensation agreement was properly documented.

**ANSWER:** The allegations of Paragraph 29 are denied, except it is admitted that Brunner

met with Dorsey Kleger-Heine, Dyve's outside general counsel, in late January 2018 to discuss

Brunner's role with the company.

30.     On February 14, Brunner then told Jeffrey Byers, General Manager of Topical Edge, that he was frustrated with the incomplete paperwork and the fact that he still did not have a written compensation agreement in place.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to

the allegations of Paragraph 30 and on that basis, denies those allegations.

31.     A day later, on February 15, Brunner and Beal had another conversation.  Beal took responsibility for failing to get Brunner's compensation package finalized.  On February 20, 2018, Brunner attended a meeting with Beal to again discuss a compensation agreement.  Beal promised to have a complete agreement prepared by the end of March.  However, Beal did not provide Brunner with an agreement by the end of March.

**ANSWER:** The allegations of Paragraph 31 are denied, except it is admitted that the

parties were engaged in discussions regarding a possible compensation increase for Brunner, and

the parties had not agreed on new terms by the end of March 2018.

32.     In the spring of 2018, Dyve hired Jim McGee to be its Chief Operating Officer. McGee recognized that many employment and equity agreements, including Brunner's, had not been finalized.  Since Beal never provided Brunner with the agreement promised by the end of March, Brunner and McGee met in June to go over the compensation package Brunner and Beal had discussed in February.  As a new employee, McGee was not familiar with the history of Brunner's compensation negotiations nor the inventive accomplishments of Brunner.

**ANSWER:** The allegations of Paragraph 32 are denied, except it is admitted that Dyve

hired McGee as Chief Operating Officer in Spring 2018 and the parties had not agreed on the

terms of a potential compensation increase for Brunner at that time.

33.     On July 10, 2018, Beal and McGee spoke with Brunner about compensation again.  The CEO and COO presented Brunner with a table proposing vesting of a 2.867% equity pool.  Two days later, McGee emailed an employment offer, but the offer did not represent the table that Brunner had been given on July 10.  After more than five months, Dyve still had not given Brunner an employment agreement that matched the tentative agreement he and Beal had reached in February.

**ANSWER:** The allegations of Paragraph 33 are denied, except it is admitted that Beal and McGee spoke with Brunner about compensation on July 10, 2018.

34.     All told, Brunner had been asking Dyve to finalize his employment and compensation agreement for more than a year. Dyve repeatedly promised it would finalize an agreement, but either failed to provide any agreement or left out key conditions that Brunner had been promised. Finally, Dyve agreed to hire an attorney for Brunner to assist Brunner's negotiations with the company, but limited that representation to eight hours.

**ANSWER:** The allegations of Paragraph 34 are denied, except it is admitted that Dyve hired an attorney of Brunner's choosing to assist Brunner with the negotiation.

35.     A week later, on July 31, 2018, all employees at Dyve received an email from McGee about a change to their option agreement and incentive plans. McGee asked all employees to re-sign their agreements. Brunner did not sign the agreement. Dyve's new human resources representative sent Brunner a reminder to sign the agreement. Brunner replied that he could not sign the agreement until his compensation agreement was finalized.

**ANSWER:** The allegations of the first three sentences of Paragraph 35 are admitted. The allegations of the fourth sentence of Paragraph 35 are denied.

36.     On August 30, 2018, Dyve delivered an ultimatum to Brunner through his attorney that Brunner must sign his employment agreement.

**ANSWER:** The allegations of Paragraph 36 are denied.

37.     On September 10, 2018 at 5:53 p.m., Brunner's attorney emailed Barlow a proposed offer. Around 6:00 p.m., Brunner became aware that he was locked out of his Dyve email account. Brunner's attorney later received an email stating that Dyve had terminated Brunner.

**ANSWER:** The allegations of the first sentence of Paragraph 37 are denied. Dyve lacks knowledge or information sufficient to form a belief as to the allegations of the remainder of Paragraph 37, and on that basis, denies those allegations, except it is admitted that Dyve terminated Brunner's employment on September 10, 2018, via email from Dyve's outside counsel to counsel for Brunner.

38.     Just a few days after firing Brunner, Dyve filed patent applications based on Brunner's inventions. Specifically, on September 14, 2018, Dyve filed the '357 and '358

applications.  A day later Dyve filed the '397 application.  In each, Dyve falsely told the PTO that Dyve was the sole owner of the Brunner applications and that Brunner had assigned to Dyve his rights to his inventions.  Dyve continues to prosecute the Brunner applications without input or cooperation from Brunner.

**ANSWER:** The allegations of the first three sentences of Paragraph 38 are denied except it is admitted that Dyve filed the '357, '358, and '397 patent applications in September 2018. The allegations of the fourth sentence of Paragraph 38 purport to characterize the contents of the '397 application, the '357 application, and the '358 application, to which Dyve respectfully refers the Court for a complete statement of their contents.  To the extent that the allegations of the fourth sentence of Paragraph 38 are inconsistent with the '397 application, the '357 application, and the '358 application, they are denied.  Dyve denies that any statements in the applications are false.  The allegations of the fifth sentence of Paragraph 38 are admitted.

39.     Approximately one week before his firing, Brunner sent several samples based on his inventions to a company spun off from Dyve called Amp Human Performance ("Amp").  On information and belief, at that time the products sold by Amp were based on Dyve's previous technology.  Consequently, these products exhibit the greasy, unpleasant feel that Brunner's inventions helped solve.  On August 12, 2019, Amp tweeted that it would soon be selling a "new and improved formula" that, on information and belief, is based on Brunner's inventions.  Soon after, Amp launched an advertising campaign explicitly showing the differences between the previous product based on Dyve's earlier formulas, and the product that, on information and belief, is based on Brunner's inventions:



KICKSTARTER WEBSITE, AMP HUMAN PERFORMANCE WEBPAGE, *available at*:

https://www.kickstarter.com/projects/amp-human/pr-lotion-a-performance-and-recovery-sports-lotion.

**ANSWER:** The allegations of the first three sentences of Paragraph 39 are denied.  The remainder of Paragraph 39 purports to characterize the contents of an AMP tweet and a Kickstarter webpage, to which Dyve respectfully refers the Court for a complete statement of their contents.  To the extent that the allegations of Paragraph 39 are inconsistent with the AMP tweet and referenced Kickstarter webpage, they are denied.

40.     Brunner, as an inventor, owns his inventions.  He never assigned those inventions to Dyve.  By improperly asserting ownership over all of Brunner's inventions to Brunner, to third-party companies, and to the Patent Office, Dyve is depriving Brunner of his

ownership rights to his inventions.  Dyve is also precluding Brunner from seeking compensation from other companies in exchange for licenses to Brunner's inventions.  Finally, Dyve is preventing Brunner from taking over, or in the alternative participating in, the prosecution of the Brunner applications in front of the PTO.  Consequently, a dispute exists between Brunner and Dyve as to the ownership of the Brunner applications.

**ANSWER:** The allegations of Paragraph 40 are denied.

## COUNT I
**(Declaratory Judgment of Patent Application Ownership of the Brunner Applications)**

41.     Brunner realleges and incorporates by reference the allegations set forth in paragraphs 1-40.

**ANSWER:** Defendant incorporates each response as set forth above in Paragraphs 1-40.

42.     Based on the foregoing, Brunner is the sole owner of the Brunner applications, as well as the technology and inventions underlying those applications and disclosed therein.

**ANSWER:** The allegations of Paragraph 42 are denied.

43.     Based on the foregoing, Brunner may exclude others from practicing any inventions from claims that issue from the Brunner applications.  Brunner also may license any inventions disclosed and/or claimed in the Brunner applications (and any patents that may issue from the Brunner applications).

**ANSWER:** The allegations of Paragraph 43 are denied.

44.     Based on the foregoing, Dyve's actions have clouded and continue to cloud Brunner's ownership rights and title to the Brunner applications and inventions disclosed therein. Dyve intends to continue its unlawful activity, and Brunner continues to and will continue to suffer irreparable harm—for which there is no adequate remedy at law—from Dyve's unlawful activity unless this Court declares and confirms Brunner's rights concerning the Brunner applications and inventions disclosed therein, and enjoins Dyve from asserting ownership of the Brunner applications.  Absent a declaration from this Court, Dyve will continue to take actions inconsistent with Brunner's ownership in the Brunner applications, and Brunner will continue to be damaged by Dyve's actions.

**ANSWER:** The allegations of Paragraph 44 are denied.

## COUNT II
**(Declaratory Judgment of Co-Ownership Of The Brunner Applications)**

45.     Brunner realleges and incorporates by reference the allegations set forth in paragraphs 1-40.

**ANSWER:** Defendant incorporates each response set forth above in paragraphs 1-40.

46.     Based on the foregoing, and in the alternative, Brunner is at minimum a co-owner of the Brunner applications, as well as the technology and inventions underlying those applications and disclosed therein.  Dyve, at most, is a co-owner of the Brunner applications.

**ANSWER:** The allegations of Paragraph 46 are denied.

47.     Based on the foregoing, Brunner is authorized to license any inventions disclosed and/or claimed in the Brunner applications (and any patents that may eventually issue from the Brunner applications).

**ANSWER:** The allegations of Paragraph 47 are denied.

48.     Based on the foregoing, Dyve's actions have clouded and continue to cloud Brunner's ownership rights and title to the Brunner applications and inventions disclosed therein. Dyve intends to continue its unlawful activity, and Brunner continues to and will continue to suffer irreparable harm—for which there is no adequate remedy at law—from Dyve's unlawful activity unless this Court declares and confirms Brunner's rights concerning the Brunner applications and inventions disclosed therein, and enjoins Dyve from indicating that it is the sole owner of the Brunner applications.  Absent a declaration from this Court, Dyve will continue to take actions inconsistent with Brunner's ownership in the Brunner applications, and Brunner will continue to be damaged by Dyve's actions.

**ANSWER:** The allegations of Paragraph 48 are denied.

## PRAYER FOR RELIEF

Plaintiff's Prayer for Relief contains no factual assertions that require a response.  To the extent a response may be deemed necessary, Dyve denies that Plaintiff is entitled to any relief whatsoever, including any relief requested in any subparagraph of his Prayer for Relief.

## <u>DEFENSES</u>

Defendant asserts the following defenses with respect to the causes of action alleged in the Complaint, without assuming the burden of proof or persuasion where such burden rests on the Plaintiff.  Defendant reserves the right to amend or to supplement its defenses as discovery progresses.

**FIRST DEFENSE**

The Complaint, in whole or in part, fails to state a claim against Defendant upon which relief may be granted.

**SECOND DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of waiver and/or acquiescence.

**THIRD DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands and/or the doctrine of *in pari delicto*.

**FOURTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the terms of the Non-Disclosure Agreement, the Employment Agreement, and the Employee Proprietary Information and Invention Agreement entered by the parties.

**FIFTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the hired to invent doctrine.

\*     \*     \*

WHEREFORE, Defendant Dyve Biosciences, Inc. respectfully requests that this Court enter judgment for it and against Plaintiff, that Plaintiff be denied any and all relief, and that the Court require Plaintiff to reimburse Dyve for its costs and expenses to defend his suit, and grant it such other and further relief as may be just and appropriate.

## COUNTERCLAIMS

Defendant and Counterclaim Plaintiff Dyve Biosciences, Inc. ("Dyve" or the "Company"), by and through its undersigned attorneys, states as follows for its counterclaims against Plaintiff and Counterclaim Defendant Seth Brunner.

## NATURE OF THE ACTION

1.      Dyve brings these Counterclaims against Seth Brunner for (1) breach of contract based upon Counterclaim Defendant Brunner's violation of the assignment, forum, and confidentiality provisions in an employment agreement between Dyve and Brunner, dated June 8, 2017 (the "Employment Agreement"), attached hereto as Exhibit A, and (2) a declaratory judgment that Brunner has no rights to or interest in Dyve's intellectual property.

2.      Dyve is an innovative and inventive company that uses breakthrough technology to create more effective topical pharmaceuticals for a broad spectrum of patient populations.

3.      Dyve hired Brunner in June 2017 to serve as Dyve's Director of Research and to invent on behalf of Dyve.  Before beginning work for Dyve, Brunner signed both a non-disclosure agreement ("NDA") and the Employment Agreement, which governed the terms of Brunner's employment with Dyve.

4.      The Employment Agreement included a provision assigning all intellectual property Brunner conceived, developed or acquired in the course of his employment with Dyve (the "Assignment Provision"), a provision prohibiting Brunner from disclosing confidential Company information to others outside the Company (the "Confidentiality Provision"), and a provision providing that any disputes regarding the Employment Agreement or related matters would be governed by California law and be brought in a California Federal or state court (the "Forum Selection Clause").

5.       In addition, all intellectual property Brunner conceived, developed or acquired in the course of his employment with Dyve was assigned to Dyve pursuant to Federal and state common law.

6.       Due to a failure to come to terms on increased compensation and several instances of inappropriate work place behavior by Brunner, Dyve terminated Brunner's employment on September 10, 2018.

7.       Brunner has now filed suit seeking ownership rights in three of Dyve's patent applications.  By doing so, Brunner has breached the Assignment Provision, the Forum Selection Clause, and the Confidentiality Clause of the Employment Agreement.

## **THE PARTIES**

8.       Seth Brunner is an individual residing in the State of California.

9.       Dyve Biosciences, Inc., f/k/a Ampersand Pharmaceuticals, Inc., f/k/a Intellectual Property Associates LLC, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 2545 West Hillcrest Drive, Suite 215, Thousand Oaks, CA 91320.

10.       Dyve invents products combining existing drugs with transdermal drug delivery methods to provide better efficacy and lower incidence of adverse events to the patient.  Dyve has a robust patent portfolio with proven efficacy across several indications, including, but not limited to, gout and melasma.  Dyve has significantly advanced clinical programs in gout and melasma with its technology.  Dyve's breakthrough technology will improve topical drug delivery significantly for a variety of patient populations, including people who suffer from gout, melasma, and those who have trouble tolerating drug delivery through pills or needles.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over the claims asserted in this Counterclaim pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.

12.      This Court has jurisdiction over Counterclaim Defendant Seth Brunner because he has consented to jurisdiction by asserting claims in this Court related to his employment and Dyve's patent applications.

13.      Venue exists for Dyve's counterclaims in this judicial district because they arise out of the transaction or occurrence that is the subject matter of Brunner's claim.  Venue is improper, however, under the Employment Agreement.

## FACTUAL ALLEGATIONS

### A.      Dyve Biosciences, Inc. Hires Brunner

14.      Dyve hired Brunner in June 2017, on the recommendation of Elias Kfoury.

15.      Kfoury had been a Special Operations Medic with the United States Navy prior to his business career.

16.      In early 2017, Dyve was in negotiations with Kfoury to join Dyve and was eventually hired as the General Manager of the Tactical division.  The Tactical division was created to develop and provide allied armed forces and law enforcement with novel human performance and pharmaceutical products and to leverage these technologies into the broader Dyve R&D program.  Dyve was interested in pursuing potential grant and procurement opportunities with the Department of Defense ("DOD"), and specifically marketing products to U.S. Special Operations Forces.

17.      In the course of discussions with Dyve, Kfoury petitioned Dyve to hire Brunner. Kfoury believed that Brunner could be valuable to Dyve's product development, due to his

experience as a formulation chemist.  At the time, however, Dyve could not accommodate a second salary for Brunner.  Kfoury offered to split his prospective salary in order to get Brunner hired.  Dyve agreed to this arrangement, and began negotiating employment agreements with Kfoury and Brunner in or around May 2017.

18.     Dyve hired Brunner based upon Kfoury's representation that Brunner was a formulation chemist who could assist Dyve by reviewing existing inventions and helping to develop new ones.  Thus, Brunner's primary job duty when he joined Dyve was to work as a formulation chemist and invent new products and technology for Dyve.

19.     Before starting employment, both Dyve and Brunner insisted that the parties first agree on a non-disclosure agreement.  Dyve and Brunner also agreed that it was important to have Brunner's employment agreement finalized and signed before he began work for Dyve.

20.     In a May 7, 2017 email to Ryan Beal, Dyve's Chief Executive Officer, Brunner stated, "Few things I really want to get accomplished this week . . ..  I. Sign any NDAs/Employment agreements necessary."  Brunner signed the Non-Disclosure Agreement (the "NDA"), attached hereto as Exhibit B on May 10, 2017.

21.     Paragraph 3 of the NDA provides, "Recipient hereby assigns to the company any results and work product resulting from the work and interactions with the company, including without limitation any business or technical innovations, original works of authorship, developments, concepts or inventions created for the company and hereby assigning to the company, any proprietary or intellectual property rights therein.  Recipient understands these rights are the property of and owned by the company.  Recipient further understands that when applicable, such services shall be works for hire and Recipient hereby assigns these to the company to the extent necessary to give effect to the company's ownership thereof.  Recipient

22

understands that Recipient will not retain any rights to any product of service of, or any intellectual property rights derived or produced by, the company from or through the work and interactions with the company."

22.     During the next two months, Dyve and Brunner negotiated the details of Brunner's employment agreement.   Kfoury played a significant role in these negotiations, often communicating directly with Ryan Beal, Dyve's CEO, on Brunner's behalf.

23.     On June 7, 2017, Beal emailed Brunner a finalized copy of the Employment Agreement.

24.     On June 8, 2017, Brunner met with Beal at the Company's Thousand Oaks office. At that meeting, Brunner handed Beal his signed Employment Agreement.

25.     That same day, Kfoury emailed Jeffrey Byers, AmpHP's Chief Executive Officer, Erica Good, AmpHP's Chief Operating Officer, Beal, and Brunner stating, "Seth and I have gotten the EAs [Employment Agreements] behind us and are moving forward with our roadmap."

> **B.    Terms of Brunner's Employment Agreement**

26.     Brunner's and Kfoury's employment agreements with Dyve were nearly identical. The only material difference in the agreements was that Brunner had the title "Director of Research, Tactical" while Kfoury had the title, "General Manager, Tactical."

27.     Paragraph 9 of Brunner's Employment Agreement contains an assignment provision, which states, "Any and all information, data, inventions, discoveries, materials, notebooks and other work product which THE EMPLOYEE conceives, develops or acquires during his employment with THE COMPANY, which directly or indirectly relates to work performed for THE COMPANY, shall be the sole and exclusive property of THE COMPANY."

28.     Brunner never communicated a reluctance to agree to an assignment provision generally or the specific assignment provision in the Employment Agreement.

29.     The Employment Agreement contained a confidentiality provision in paragraph 7, which states, "The Employee shall not, for any reason whatsoever, during or after the termination of his employment with THE COMPANY, use, disclose or allow access to, for his benefit or for that of another the Confidential Information or the Confidential Communications (or any part thereof) to any person, firm, corporation, association or other entity for any reason or for any purpose whatsoever."

30.     The Confidentiality Provision also provides that upon the termination of employment, "THE EMPLOYEE shall return to THE COMPANY any of the Confidential Information, Confidential Communications, charts, company literature, reports, employer credit cards or other proprietary materials of THE COMPANY then in THE EMPLOYEE's possession."

31.     Paragraph 7 of the Employment Agreement defines "Confidential Information" to include "the intellectual property, marketing plans and business strategy, the names and addresses of THE COMPANY's customers, the names and addresses of THE COMPANY's supplier, trade secrets and any other confidential and proprietary information concerning the business or affairs of THE COMPANY."

32.     Paragraph 7 of the Employment Agreement defines "Confidential Communications" to mean "any communications, whether written, oral or otherwise, that THE COMPANY or any of THE COMPANY's employees has with THE COMPANY's existing or prospective customers and clients."

33.    Paragraph 19 of the Employment Agreement includes a forum selection clause, which states, "Any actions concerning enforcement of this Agreement or in any way relating to the subject to the subject matter of this Agreement shall be litigated only in California state or federal courts of proper jurisdiction and venue."

34.    Paragraph 18 of the Employment Agreement provides that in the event of breach by the employee, Dyve is entitled "to obtain damages for any breach of [the] Agreement," "to enjoin THE EMPLOYEE from engaging in such activity," or to pursue any other remedy that Dyve may elect to invoke.

35.    On January 10, 2018, Barbara Prusinki, Dyve's Special Project Manager, held a meeting of Dyve's employees to review the new company handbook and the revised Employee Proprietary Information and Inventions Agreement, attached hereto as Exhibit C.  At the conclusion of this meeting, Prusinki collected the signature pages of each and every employee, including Brunner.

36.    By signing and returning the signature page, Brunner agreed to the following terms: "I [employee] hereby assign, and agree to assign, to the Company, without additional compensation, my entire right, title and interest in and to (a) all Creations, and (b) all benefits, privileges, causes of action and remedies relating to the Creations, whether before or hereafter accrued. . ..  The term Creations includes, but is not limited to, . . . inventions, [], ideas, processes, technology, formulas, . . . discoveries, modifications and improvements . . . that relate in any manner to the actual or demonstrably anticipated business or research and development of the Company or its affiliates, and that are made, conceived or developed by me (either alone or jointly with others), or result from or are suggested by any work performed by me (either alone or jointly with others) for or on behalf of the Company or its affiliates, (i) during the period of

my employment with the Company, whether or not made, conceived or developed during regular business hours or (ii) after termination of my employment if based on Proprietary Information.  I agree that all such Creations are the sole property of the Company or any other entity designated by it."

### C.   <u>Brunner's Work at Dyve</u>

37.    Brunner's primary job when he joined Dyve was to work as a formulation chemist and to invent new technology and products for Dyve.

38.    Brunner's own statements show that he understood that his primary job responsibility was to invent.  In or around June 2018, the Company engaged R&D Incentives Group ("RDIG") to consult with the Company regarding R&D issues, including identifying individuals in the Company who worked on Research and Development for potential R&D tax credits.  On information and belief, Brunner was the primary person to whom RDIG spoke in preparing a Research and Development Survey for Dyve (known as Intellectual Property Associates at the time).

39.    The survey shows the percentages of time that Dyve employees dedicated to research and development.  Brunner provided information to RDIG for the survey that confirmed that 100% of his work was dedicated to research and development.  Additionally, in a recorded interview conducted by RDIG related to his work at Dyve, Brunner stated that from the time he began working at Dyve, he spent all his time inventing, with 80% spent in the lab formulating and making improvements to Dyve's technology and 20% spent on meetings and background research relating to those inventions.

40.     In or around February 2018, due to his perceived contributions to Dyve, Brunner became more vocal about his desire for increased compensation, including equity in the Company.

41.     Dyve was willing to consider increasing Brunner's salary and equity option grants, provided the parties could agree on the level of Brunner's increased compensation and corresponding equity grants.  Dyve and Brunner began to discuss salary levels, bonus structures, and additional option grants.

42.     Brunner also worked with Dyve to develop a job description for his position.

43.     In an email sent on March 23, 2018 to Dorsey Kleger-Heine, outside counsel to the Company, Karen Ephraim, a project manager from Ms. Kleger-Heine's office, and Jim McGee, Dyve's Chief Operating Officer, Brunner explained his use of "invention disclosures" in his draft job description, stating "invention disclosures are basically a disclosure to Ryan [Beal] and/or our patent counsel of any novel findings during our course of formulation and research that fall outside our [sic] included in our current IP portfolio.  Its [sic] meant to give the R&D team some credit, but is [sic] also protects the interest of the company so that no one sits on ideas for personal gain in the future."

44.     The job description Brunner approved lists the following tasks among his responsibilities and duties: "[d]rive and direct the scientific research and development activities including discovery, evaluation, development, licensing of new products through the management of product or project teams," "[i]nstigate, lead and develop patent portfolio efforts around transdermal delivery bringing rigor, clarity and focus on high value IP assets;" "[d]eliver value across the whole life cycle of patent portfolio development, from the inception of innovation through to monetization;" "[f]oster an innovative culture that constantly delivers new

intellectual property;" "[e]nsure that . . . novel findings discovered during the course of research are disclosed to the [CEO] and/or the Company's patent counsel."

45.     Additionally, the job description lists the following under required experience: "[s]uccessful track record of new product development and launch;" "[e]xperience generating and disclosing intellectual property;" and a "[m]inimum of ten years of experience in product development within a physical science, biotechnology, or pharmaceutical setting."

46.     To negotiate his new compensation package, in and around August of 2018, Dyve hired and paid for an attorney of Brunner's choice, to aid him in the discussions regarding the new compensation terms.  The Company provided an attorney for Brunner in order to demonstrate its good faith in negotiating with Brunner and in the hope that the attorney would bring a voice of reason to Brunner's side of the negotiation.

47.     On August 4, 2018, after an extended period of back-and-forth over the terms of Brunner's increased compensation, Beal emailed Brunner and his counsel Dyve's best and final offer.  It provided that Brunner would receive a new base salary of $120,000 annually and the possibility of a bonus up to 30% of the base salary.  It also memorialized four different stock option grants to Brunner.  The first two smaller grants reflected the grants included in Brunner's Employment Agreement.  ("Initial Grant A" and "Initial Grant B").  The third grant was larger and would fully vest upon Brunner's signing of the new agreement ("2017 Burn Incentive"). The fourth grant involved larger grants that would be awarded if Brunner achieved various milestones.  ("Role-Specific Performance Based Equity Grants").

48.     Despite Dyve's best efforts to come to a reasonable agreement, Brunner did not accept the August 4 offer.

### D.      Brunner's Employment is Terminated

49.     As Brunner and Dyve discussed new compensation terms but failed to reach agreement, Brunner's workplace behavior became increasingly unsatisfactory, and at times, unacceptable.

50.     For example, on information and belief, Brunner threatened to take Dyve's proprietary and confidential technology and information to either start a new company or to work for an existing competitor.

51.     On information and belief, in or around August 2018, Brunner stole his personnel file from Dyve, which included the only copy of his signed NDA, his signed Employment Agreement and the signed revised Employee Proprietary Information and Invention Agreement.

52.     Prusinki was responsible for maintaining Dyve's personnel files and collecting standard company documents that have to be signed by all employees.

53.     In or around August 2018, Prusinki noticed that Brunner's employment file was no longer in the file cabinet.  The entirety of his file was missing, along with the manila file folder in which Brunner's documents were kept.

54.     When cleaning out Brunner's desk after his termination, Prusinki discovered a personnel document of another employee, Philippe Burnham.  On information and belief, Brunner removed the other personnel document of Mr. Burnham because it was either located next to Brunner's employee file due to alphabetical order or misfiled in it.  Brunner had no legitimate reason to have possession of this personnel document.

55.     In or around late August or early September 2018, Beal was made aware of Brunner's inappropriate workplace behavior, including the removal of his personnel file.

56.     Dyve then terminated Brunner's employment on September 10, 2018, via email from Dyve's outside counsel to counsel for Brunner.

57.     On information and belief, Brunner retains possession of internal emails and other confidential documents wrongfully taken from Dyve when he left the Company.  His retention of these documents is in violation of the NDA and the Confidentiality Provision of the Employment Agreement.

**E.     Dyve's Patent Applications**

58.     In September 2018, Dyve filed U.S. Patent Applications 16/132,397, 16/132,357, 16/132,358.  Each application lists Brunner as one of multiple inventors.  The '397 patent application lists 8 inventors, the '397 patent application lists 9 inventors and the '358 patent application lists 6.

59.     The patent applications are still pending before the Patent and Trademark Office.

60.     Brunner has no ownership rights to the '397, '357, and '358 patent applications pursuant to the Assignment Provision of his Employment Agreement, the NDA, and the Employee Proprietary Information and Invention Agreement.

61.     In addition, under state and Federal common law, Brunner assigned to Dyve all intellectual property he conceived, developed or acquired in the course of his employment with Dyve.

62.     Dyve hired Brunner to invent.  Both parties understood that any patent filings based on research and product development in the course of employment at Dyve would be assigned to Dyve, which would prosecute all patent applications.

63.     On September 5, 2019, Brunner filed this suit in the United States District Court for the District of Delaware asserting ownership rights in the patent applications, in breach of the

Assignment Provision, the Forum Selection Clause and the Confidentiality Provision in the Employment Agreement.

## COUNT I
### (BREACH OF CONTRACT)

64.    Dyve Biosciences, Inc. restates the allegations made in paragraphs 1-63.

65.    The Employment Agreement is a valid, enforceable contract.

66.    Dyve has fully performed all its obligations under the Employment Agreement.

67.    Pursuant to Paragraph 7 of the Employment Agreement, Brunner agreed not to disclose confidential or proprietary information regarding intellectual property, business affairs or confidential communications to any outside person, corporation, or other entity, and to return all confidential information and communications to Dyve.

68.    By maintaining possession of both confidential information and communications from Dyve, Brunner has breached Paragraph 7 of the Employment Agreement.

69.    Pursuant to Paragraph 9 of the Employment Agreement, Brunner assigned any invention or patent rights to Dyve Biosciences, Inc.

70.    By claiming ownership rights in the '387, '357 and '358 patent applications, Brunner has breached Paragraph 9 of the Employment Agreement.

71.    Pursuant to Paragraph 19 of the Employment Agreement, any action concerning enforcement of the Agreement or in any way relating to the subject matter of the agreement is required to be litigated in a California state or Federal court.

72.    By filing the present action in the United States District Court for the District of Delaware, Brunner has breached Paragraph 19 of the Employment Agreement.

73.     Dyve has been damaged by the aforementioned breaches in an amount to be proved at trial.  Such damages include, *inter alia*, Dyve's attorneys' fees and costs in litigating this action in this Court.

**COUNT II**
**(DECLARATORY JUDGMENT)**

74.     Dyve Biosciences, Inc. restates the allegations made in paragraphs 1-63.

75.     Pursuant to Paragraph 9 of the Employment Agreement, Paragraph 3 of the NDA and the Employee Proprietary Information and Invention Agreement, Brunner assigned to Dyve all intellectual property Brunner conceived, developed or acquired in the course of his employment with Dyve.

76.     In addition, Federal and state common law provide that if an employee is hired to invent, then all intellectual property the employee conceived, developed or acquired in the course of his employment is automatically assigned to the employer.

77.     Brunner was hired by Dyve to invent.

78.     Brunner assigned all intellectual property to Dyve that he conceived, developed or acquired in the course of his employment with Dyve.

79.     Pursuant to 28 U.S.C. § 2201, there is an actual, substantial, continuing and justiciable controversy between the parties regarding ownership rights in the '387, '357 and '358 patent applications.

80.     Dyve requests a declaratory judgment that Brunner has no rights to or interest in Dyve's intellectual property, including, *inter alia*, the '387, '357 and '358 patent applications and any continuations, continuations-in-part, reissue, re-examination, term restoration and divisional applications and patents issuing therefrom or that claim priority back to any such patent applications or issued patents.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dyve Biosciences, Inc. requests a trial by jury of any issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiff Dyve Biosciences, Inc. respectfully asks the Court to:

A.   Declare that Dyve Biosciences, Inc. is the owner of each of the disputed patent applications and the technology and inventions underlying and disclosed therein;

B.   Declare that Counterclaim-Defendant Brunner is estopped from asserting any claim inconsistent with Dyve's ownership of the disputed applications, and the technology and inventions underlying and disclosed therein;

C.   Declare that Counterclaim Defendant Brunner breached his employment agreement with Dyve;

D.   Award Dyve damages sufficient to compensate it for Brunner's breaches of his employment agreement, including all attorney fees and costs incurred in this suit, together with pre- and post-judgment interest;

E.   Issue a permanent injunction enjoining Counterclaim-Defendant Brunner from further actions inconsistent with Dyve's ownership and rights to the disputed applications and any resulting technologies, and from further actions inconsistent with his obligations under the Employment Agreement;

F.   Award Dyve such other and further relief as this Court may deem just and proper.

POTTER ANDERSON & CORROON LLP

By:   */s/ Matthew E. Fischer*
      Matthew E. Fischer (#3092)
      Jonathan A. Choa (#5319)
      David A. Seal (#5992)
      P.O. Box 951
      Wilmington, DE 19899
      (302) 984-6000
      mfischer@potteranderson.com
      jchoa@potteranderson.com
      dseal@potteranderson.com

Dated:  October 30, 2019

*Attorneys for Defendant-Counterclaimant*
*Dyve Biosciences, Inc.*

6459487